# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

MAURY SINGER,                               )
                                            )
    Plaintiff,          )  Case No.: 2:20-cv-01556-GMN-EJY
 vs.                                    )
                                            )  **ORDER GRANTING DEFENDANTS'**
BRIAN WILLIAMS, *et al.*,                   ) **MOTION FOR SUMMARY JUDGMENT**
                                            )
    Defendants.          )
                                            )
_____            )

Pending before the Court is Defendants Scott Alexander, Bob Faulkner, Jennifer Nash, Michael Pascua, and Richard Wulff's Motion for Summary Judgment, (ECF No. 26). Plaintiff Maury Singer filed a Response, (ECF No. 31), to which Defendants filed a Reply, (ECF No. 43).

Also pending before the Court is Plaintiff's Motion for Summary Judgment, (ECF No. 25). Defendants filed a Response, (ECF No. 32), to which Plaintiff filed a Reply, (ECF No. 43).

For the reasons discussed below, the Court **GRANTS** Defendants' Motion for Summary Judgment and **DENIES** Plaintiff's Motion for Summary Judgment.

## I. BACKGROUND

This case arises out of Defendants alleged deliberate indifference to unsafe conditions and Plaintiff's serious medical needs during his incarceration at High Desert State Prison ("HDSP"). (*See generally* First Am. Compl. ("FAC"), ECF No. 5). After the Court's Screening Order, Plaintiff's remaining claims are that Defendants Scott Alexander, Michael Pascua, and Jennifer Nash ("Unsafe Conditions Defendants") were deliberately indifferent to unsafe prison conditions at HDSP in violation of his Eighth Amendment rights, and that Defendants Bob

Faulkner, Jennifer Nash, and Richard Wulff ("Deliberate Indifference Defendants") were deliberately indifferent to Plaintiff's serious medical needs in violation of his Eighth Amendment rights. (*See generally* Screening Order, ECF No. 7). The specific facts underlying each claim are outlined below.

**A. Alleged Unsafe Conditions at HDSP**

Plaintiff works as a gym porter at HDSP. (Singer Aff. ¶ 3, Pl.'s Mot. Summ. J., ECF No. 25). While working on August 23, 2018, Plaintiff slipped and fell in a puddle. (*Id.* ¶ 4); (Leory Collins Decl. ¶ 7, Ex. A to Pl.'s Mot. Summ. J., ECF No. 25). Plaintiff reported his fall to his supervisor Larry Lee, who asked Plaintiff if he wanted a call to the infirmary to receive medical attention. (Singer Aff. ¶ 7, Pl.'s Mot. Summ. J.). Plaintiff declined[1] because he thought he suffered only a twisted ankle. (*Id.*). As discussed in greater detail below, Plaintiff was mistaken, and he had, in fact, ruptured his Achilles tendon. (Medical Records at 2, Ex. D to Defs.' Mot. Summ. J., ECF No. 28-2).

According to Plaintiff, the HDSP's gym ceiling leaked "on many occasions" before his fall. (Singer Aff. ¶ 10, Pl.'s Mot. Summ. J.). Plaintiff had previously sent kites[2] and interdepartmental mail to the Unsafe Conditions Defendants and the HDSP maintenance department concerning the leaking ceiling.[3] (FAC ¶¶ 10–14). He and other inmates assert that Defendant Pasqua did not close the gym when the ceiling leaked. (Singer Aff. ¶¶ 15–16, Pl.'s Mot. Summ. J.); (Dennis Cooper Aff. ¶¶ 1–6, Ex. K to Pl.'s Mot. Summ. J., ECF No. 25); (Sammy Collins Aff. ¶¶ 1–6, Ex. L to Pl.'s Mot. Summ. J., ECF No. 25). Instead, Defendant

---

[1] Plaintiff's MSJ includes more than one Affidavit signed by Plaintiff. This Court is referencing Plaintiff's 2023 Affidavit found at page 31 of the MSJ, not Plaintiff's 2020 Affidavit at Ex D.

[2] Kites are institutional forms used by inmates to request medical and other action, under which inmates must submit written records describing the relief sought. (*See* Order Mot. Dismiss 2:25, ECF No. 95 in *Leal v. Hutchings et al.*, No. 2:21-cv-1965-GMN-MDC).

[3] Complaints and verified motions function as affidavits and may be considered as evidence if they are based on personal knowledge and set forth specific facts admissible in evidence. *Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995); *Johnson v. Meltzer*, 134 F.3d 1393, 1399–1400 (9th Cir. 1998). So, the Court considers the allegations in Plaintiff's First Amended Complaint to the extent they comply with these requirements.

Pasqua instructed the porters to mop the areas where water accrued and place safety cones around the wet areas. (Singer Aff. ¶ 14, Pl.'s Mot. Summ. J.); (Michael Pascua Resp. Pl.'s Interrog. 8:17–20, Ex. B to Reply Pl.'s Mot. Summ. J., ECF No. 25). Plaintiff maintains that he repeatedly informed Defendant Michael Pasqua that the ceiling leaked, but Defendant Pasqua was unable or unwilling to get the HDSP maintenance department to make repairs. (Singer Aff. ¶¶ 10–13, Pl.'s Mot. Summ. J.).

According to Defendant Pasqua, however, he reported any leaks he was made aware of to the HDSP maintenance department. (Michael Pascua Resp. Pl.'s Interrog. 6:22–27, Ex. B to Reply Pl.'s Mot. Summ. J.). He witnessed the maintenance department repair the gym ceiling on many occasions during his tenure at HDSP. (*Id.* 7:4–10). HDSP maintenance records state that the gym roof had been repaired on several occasions both before and after the date of Plaintiff's fall. (*See generally* HDSP Repair Log, Ex. I to Defs.' Mot. Summ. J., ECF No. 26-9).

Over the next several months, Plaintiff wrote kites and interdepartmental mail to the Unsafe Conditions Defendants reporting leaks in the gym ceiling. (Exs. B-B-B to L-L-L, Pl.'s Mot. Summ. J., ECF No. 25). Plaintiff asserts that these writings went unaddressed, and that the gym ceiling continued to leak. (Singer Aff. ¶¶ 72–75, Pl.'s Mot. Summ. J.).

In December 2019, Plaintiff suffered another fall which he believes re-ruptured his Achilles tendon. It is unclear, however, where this fall occurred. Specifically, Plaintiff's FAC alleges that the fall occurred "when [he] entered the gym and slipped in a puddle of water near the staff office." (FAC ¶ 38). But Plaintiff's exhibits to his Motion for Summary Judgment indicate he tripped over an uncovered drainage pipe in HDSP's kitchen. (*See* Pl. Letter Mar. 4, 2020, at 2, Ex. F-F to Pl.'s Mot. Summ. J., ECF No. 25); (Pl. Informal Grievance at 1–4, Ex. W-W to Pl.'s Mot. Summ. J., ECF No. 25); (Justin Lane Decl. ¶¶ 1–9, Ex. Z-Z to Pl.'s Mot.

Summ. J., ECF No. 25).  So, the record shows that Plaintiff experienced a second fall, but there is a material dispute of fact over where it occurred.

Plaintiff's unsafe prison conditions Eighth Amendment claim is based on the Unsafe Conditions Defendants alleged deliberate indifference to the threat the gym ceiling leak posed to inmate safety. (*See generally* FAC).

### B. Deliberate Indifference to Medical Condition

The day after Plaintiff's first fall in August 2018, he sent a kite to the HDSP medical department requesting an ankle brace. (Aug. 24, 2018, Medical Kite, Ex. E to Pl.'s Mot. Summ. J., ECF No. 25).  In September 2018, Plaintiff received a response stating that he would be scheduled for a medical appointment. (Pl.'s Disclosure at 2, Ex. C to Defs.' Mot. Summ. J., ECF No. 26-4).  Plaintiff later spoke with an unnamed female nurse who told him it sounded like he had an Achilles injury. (Singer Aff. ¶ 9, Reply Pl.'s Mot. Summ. J., ECF No. 42).

In January 2019, Plaintiff sent a kite requesting medical attention for his Achilles tendon. (Singer Disclosure at 6, Ex. C to Defs.' Mot. Summ. J., ECF No. 26-4).  The kite was responded to with a notice that Plaintiff would be scheduled to see the medical department. (*Id.*).  Plaintiff was seen by HDSP medical staff in February, May, and July 2019, and was provided ibuprofen for pain management. (Medical Records at 5–6, 16–17, Ex. D to Defs.' Mot. Summ. J., ECF No. 28-2).

On July 24, 2019, nearly 11 months after the date of his fall, Plaintiff was examined by Dr. Richard Wulff, an orthopedic specialist. (*Id.* at 2).  According to Dr. Wulff, this was the first time he met Plaintiff or became aware of his medical conditions. (Dr. Wulff Resp. Pl.'s Interrog. 11:15–18, Ex. F to Defs.' Mot. Summ. J., ECF No. 26-6).  As a contract service provider, Dr. Wulff had no control over the scheduling of inmates for appointments at his clinic. (Dr. Wulff Decl. ¶ 7. Ex. K to Defs.' Mot. Summ. J., ECF No. 26-11).

Dr. Wulff performed a physical examination and reviewed X-ray images of Plaintiff's ankle. (Medical Records at 2, Ex. D to Defs.' Mot. Summ. J.).  The X-ray results were normal. (*Id.*).  Dr. Wulff determined that Plaintiff had a fully intact and structurally sound Achilles tendon with very mild weakness and good function. (*Id.*).  He concluded that Plaintiff had a "healed, untreated, Achilles tendon rupture," and recommended Plaintiff perform stretching exercises to strengthen his Achilles. (*Id.*).  Dr. Wulff found that neither surgery nor an MRI ("Medical Resonance Imaging") was needed but noted that surgery could be considered if Plaintiff re-ruptured his Achilles tendon. (*Id.*).

Later that month, Plaintiff filed a request order stating that he was entitled to seek a second opinion of his injury and that an MRI was necessary because he continued to experience pain. (*Id.* at 17).  In November 2019, Plaintiff submitted another medical kite, advising the HDSP medical department that he was still in pain, and again requesting an MRI and further treatment. (Nov. 2019 Medical Kite, Ex. N-N to Pl.'s Mot. Summ. J., ECF No. 25).  The next month, Plaintiff alleged he re-ruptured his Achilles tendon. (Medical Records at 4, Ex. D to Defs.' Mot. Summ. J.).

According to Plaintiff, he sent Defendant Faulkner, the head of nursing at HDSP, interdepartmental mail in December 2019, claiming that the delay in receiving medical treatment for his Achilles tendon constituted deliberate indifference. (Dec. 19, 2019, Letter, Ex. J-J to Pl.'s Mot. Summ. J., ECF No. 25).  After he was seen by HDSP medical in January Plaintiff sent Defendant Faulkner another letter, complaining that he still needed an MRI and was given only ibuprofen for pain. (Medical Records at 9–11, 17, Ex. D to Defs.' Mot. Summ. J.); (Inmate Request Form & Jan. 2020 Letter, Ex. L-L to Pl.'s Mot. Summ. J., ECF No. 25).  Defendant Faulkner contends he never received Plaintiff's interdepartmental mail. (Defs.' Mot. Summ. J. 4:24–27, 14:17–22, 20:7–9, ECF No. 26).

Plaintiff later filed a kite and grievance in March 2020, complaining that Dr. Wulff misdiagnosed his injury, and requested a referral to another specialist for further treatment. (Mar. 2020, Grievance, Ex. M-M to Pl.'s Mot. Summ. J., ECF No. 25); (Mar. 2020, Inmate Request Form, Ex. O-O to Pl.'s Mot. Summ. J., ECF No. 25).  Defendant Faulkner, as well as Defendant Nash, an associate warden at HDSP, responded to these grievances and explained that Dr. Wulff's evaluation was not a grievable issue because he is a contract service provider. (*Id.*).

That same month, Plaintiff received a response from a separate request form he submitted stating an "MRI [was] approved and scheduled." (Inmate Request Form & Jan. 2020 Letter, Ex. L-L to Pl.'s Mot. Summ. J)  As of the filing of Plaintiff's FAC in July 2021, he had not received this MRI. (FAC at 27, 34).

Instead, in October 2020, Plaintiff was seen by Dr. Wulff, who performed a new physical examination and X-rays. (Medical Records at 4, Ex. D to Defs.' Mot. Summ. J.).  Dr. Wulff noted that Plaintiff had experienced a "possible re-rupture" but found that his Achilles was intact, with good resistance. (*Id.*).  Dr. Wulff recommended an ankle brace and advised Plaintiff on stretching exercises. (*Id.*).  No surgery or MRI was recommended. (*Id.*).  Plaintiff received the ankle brace in November 2020. (*Id.* at 22).  After this appointment, Plaintiff continued to see HDSP medical staff and receive ibuprofen. (*Id.* at 11–13, 17, 20).

According to Plaintiff, he has suffered from continuous pain because of the alleged misdiagnosis and mistreatment of his injury. (*See generally* Singer Aff. ¶¶ 28, 46–47, Resp. to Defs.' Mot. Summ. J., ECF No. 41).  Even though Plaintiff can walk, he maintains he "cannot walk correctly on [his] tiptoes[,] and the pain still exists when he [tries]." (*Id.* ¶ 21).  He contends this inability is "an obvious reminder that Defendant Wulff's diagnosis was absolutely incorrect and [he] should have been referred" to a different specialist for treatment. (*Id.*).

### C. Procedural History

Plaintiff filed this action, alleging that the Unsafe Conditions Defendants and Deliberate Indifference Defendants violated his Eighth Amendment rights. (*See generally* FAC).  The parties now file cross-motions for summary judgment, (ECF Nos. 25, 26).

## II.    <u>LEGAL STANDARD</u>

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is a sufficient evidentiary basis on which a reasonable fact-finder could rely to find for the nonmoving party. *See id.*  "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Serv. Co*., 391 U.S. 253, 288–89 (1968)).  "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (citing *United States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir. 1999)).  A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court applies a burden-shifting analysis.  "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing

the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).  In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24.  If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).  However, the nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Orr v. Bank of America*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252.  In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

Fed. R. Civ. P. 56(d) provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." To obtain relief under Rule 56(d), the nonmovant must show "(1) that [he or she] ha[s] set forth in affidavit form the specific facts that [he or she] hope[s] to elicit from further discovery, (2) that the facts sought exist, and (3) that these sought-after facts are 'essential to resist the summary judgment motion." *State of Cal. v. Campbell*, 138 F.3d 772, 779 (9th Cir. 1998).

## III.    **DISCUSSION**

The Court first addresses Defendants' Motion for Summary Judgment, viewing the facts in the light most favorable to Plaintiff to determine whether there is a genuine issue of material fact. "[W]hen simultaneous cross-motions for summary judgment on the same claim are before the court," like they are here, "the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001).

### A. Defendants' Motion for Summary Judgment

Defendants move for summary judgment on Plaintiff's claims for unsafe prison conditions and deliberate indifference in violation of the Eighth Amendment. (*See generally* Defs.' Mot. Summ. J.).  They argue that Plaintiff cannot establish a genuine dispute of material fact as to the elements of his Eighth Amendment claims, and that if the Court finds a dispute of material fact exists, they are nevertheless entitled to qualified immunity.

### 1. Unsafe Prison Conditions

The Eighth Amendment's prohibition against cruel and unusual punishment imposes duties on prison officials to "provide humane conditions of confinement." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  Although prison conditions may be restrictive and harsh, "prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Id.* (internal quotations and citations omitted); *see also Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). When a prisoner alleges injuries stemming from unsafe conditions of confinement, prison officials may be held liable only if they acted with "deliberate indifference to a substantial risk of serious harm." *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998).

Establishing deliberate indifference under the Eighth Amendment requires a two-part showing.  First, the alleged deprivation must be, in objective terms, "sufficiently serious." *Farmer*, 511 U.S. at 834 (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).  A deprivation is sufficiently serious when the prison official's act or omission results "in the denial of 'the minimal civilized measure of life's necessities.'" *Id.* (quoting *Rhodes*, 452 U.S. at 347). Second, the prison official must "know [ ] of and disregard[ ] an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837.  Thus, a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that an inmate

faces a substantial risk of harm and consciously disregards that risk by failing to take reasonable measures to abate it. *Id.* at 837–45.

The Unsafe Conditions Defendants argue that they were not deliberately indifferent because they "actively worked to repair leaks in the gym roof when they appeared and took steps to protect the safety of inmates who wanted to use the gym for recreation purposes." (Defs.' Mot. Summ. J. 17:8–12). In response, Plaintiff contends that the Unsafe Condition ignored the clear risk the leaky gym roof posed to inmates' safety. Specifically, Plaintiff argues that they knew the gym roof frequently leaked and disregarded the danger by allowing inmates to continue to use the gym and not fixing the leaks. (Resp. Defs.' Mot. Summ. J. at 10–13, 23–30).

Plaintiff's unsafe conditions claim arises from two distinct events: his slip and fall in August 2018 and his subsequent fall in December 2019. Accordingly, the Court separately addresses each fall.

### a. August 2018 Fall

First, the Court finds that the Unsafe Conditions Defendants are entitled to summary judgment on Plaintiff's claim to the extent it is based on his August 2018 fall. That is, there was no Eighth Amendment violation under Ninth Circuit precedent because Plaintiff did not suffer from any exacerbating condition which caused the puddle to pose a substantial risk of harm to him.

"'[P]oorly maintained surfaces, wet floors, and leaky roofs' do not generally pose a substantial risk of serious harm, and are instead claims fundamentally sounding in negligence—which is insufficient to violate the Eighth Amendment as a matter of law." *Miranda v. Madden*, No. 3:19-cv-01605, 2019 WL 5727444, at *5 (S.D. Cal. Nov. 4, 2019) (quoting *Pauley v. California*, No. 2:18-cv-2595, 2018 WL 5920780, at *4 & n.1 (E.D. Cal. Nov. 13, 2018)). Courts have recognized a narrow exception to this rule: when an inmate has "a known

exacerbating condition," slippery surfaces "without protective measures could create a sufficient danger to warrant relief." *Carter v. Gastelo*, No. 2:19-cv-08986, 2021 WL 2542958, at *10 (C.D. Cal. Apr. 26, 2021), *adopted by* 2021 WL 2534986 (C.D. Cal. June 17, 2021). Under this exception, "awareness of a prisoner's disability or proclivity toward falling may turn a slippery prison [surface] into a potential constitutional claim, depending on the level of danger and awareness." *Jones v. Meddly*, No. 1:17-cv-00109, 2019 WL 3302358, at *7 (E.D. Cal. July 23, 2019).

Before August 2018, Plaintiff did not have an exacerbating condition or proclivity toward falling. Instead, his claim is predicated on the fact that he fell in a puddle purportedly caused by the Unsafe Conditions Defendants inability or unwillingness to fix a leak in the ceiling or close the gym. To elevate a state law claim for negligence to the level of an Eighth Amendment violation, a Plaintiff must demonstrate more than mere awareness of a wet floor.[4] *See Jackson v. Arizona*, 885 F.2d 639, 641 (9th Cir. 1989) (holding that an allegation describing a slippery prison floor, without more, "does not state even an arguable claim for cruel and unusual punishment"), *superseded by statute as stated in, Lopez v. Smith*, 203 F.3d 1122, 1130–31 (9th Cir. 2000); *see also Julian v. Valley State Prison*, No. 1:23-cv-00013, 2023 WL 3466454, at *3 (E.D. Cal. May 15, 2023) ("Although Plaintiff claims that he told Defendants about water accumulating on his cell floor and they failed to remedy the condition, he alleges no facts or exacerbating circumstances that could elevate this simple negligence claim into a federal civil rights claim."). Without something more than a slippery floor, the

---

[4] Other circuit courts have similarly found a slip and fall, without more, does not amount to an Eighth Amendment violation. *See e.g.*, *Coleman v. Sweetin*, 745 F.3d 756, 764 & n.7 (5th Cir. 2014) (collecting cases and holding that as a matter of law, "prisoner slip-and-fall claims almost never serve as the predicate for constitutional violations"); *Pyles v. Fahim*, 771 F.3d 403, 410 & n.25 (7th Cir. 2014) ("Federal courts consistently have adopted the view that slippery surfaces and shower floors in prisons, without more, cannot constitute a hazardous condition of confinement.")); *Reynolds v. Powell*, 370 F.3d 1028, 1031 (10th Cir. 2004) ("Simply put, a slip and fall, without more, does not amount to cruel and unusual punishment. . . . Remedy for this type of injury, if any, must be sought in state court under traditional tort law principles.") (internal quotations, brackets and citation omitted).

Unsafe Conditions Defendant could not have known about an objectively serious condition creating a substantial risk of serious harm to Plaintiff.  Therefore, Plaintiff's August 2018 fall cannot support an Eighth Amendment violation, and the Unsafe Conditions Defendants are entitled to summary judgment to the extent Plaintiff's claim is based on this fall.

### b. December 2019 Fall

Plaintiff's second fall at the HDSP gym is a closer call.[5]  By this time, Plaintiff had an Achilles injury.  So, viewing the evidence in the light most favorable to Plaintiff, he had a condition which limited his mobility and potentially constituted an exacerbating circumstance. But even considering Plaintiff's injury, the Court finds that the Unsafe Conditions Defendants are entitled to summary judgment because no Eighth Amendment violation occurred.  The Ninth Circuit's decisions in *Jackson*, 885 F.2d at 639, *LeMaire v. Maass*, 12 F.3d 1444 (9th Cir. 1993), and *Frost*, 152 F.3d at 1124, are helpful in examining in Plaintiff's claim.

First, in *Jackson*, the Ninth Circuit held that slippery prison floors, without more, "do[] not state even an arguable claim for cruel and unusual punishment." *Jackson*, 885 F.2d at 641. Next, in *LeMaire*, a prisoner argued that wearing handcuffs and shackle restraints while in the shower violated the Eighth Amendment. 12 F.3d at 1457.  The Ninth Circuit concluded that "[e]ven if the floors of the shower are slippery and [the prisoner] might fall while showering, slippery prison floors . . . do not state even an arguable claim for cruel and unusual punishment." *Id.* (citing *Jackson*, 885 F.2d at 641) (internal quotation marks omitted).

After *LeMaire*, the Ninth Circuit in *Frost* found that a slippery prison floor could give rise to a constitutional claim when prison officials did not provide an inmate on crutches with

---

[5] Viewing the evidence in the light most favorable to Plaintiff, the Court assumes he fell at the HDSP gym because it presents a stronger claim.  The Court recognizes, however, that the exhibits attached to Plaintiff's Motion for Summary Judgment indicate he tripped over a drainage pipe at the HDSP kitchen.  Regardless of where Plaintiff fell, however, the Court would apply the same reasoning and reach the same outcomes.  That is, even if Plaintiff fell at the HDSP kitchen, the record does not support an Eighth Amendment claim, and alternatively, the Unsafe Conditions Defendants would be entitled to qualified immunity.

an accessible shower, despite their knowledge that the inmate's use of crutches had already caused him to fall and injure himself on several occasions on the slippery bathroom floor. 152 F.3d at 1129–30.  The Ninth Circuit observed that the prisoner's repeated injuries, in addition to his required use of crutches, raised a triable issue of fact regarding whether the prison officials' failure to provide him with adequate shower facilities violated his Eighth Amendment right. *Id.* at 1129–30.  The Ninth Circuit distinguished *LeMaire* and *Jackson* because the inmate in *Frost* had repeatedly injured himself and was faced with unsafe conditions due to his use of crutches. *Id.* at 1129.  Here, Plaintiff's case bears some similarities to *Frost*.  Viewing the evidence in the light most favorable to Plaintiff, he had an exacerbating condition, and the Unsafe Conditions Defendants were aware he slipped and fell in August 2018.

Nevertheless, the case is distinguishable from *Frost* in several key respects.  First, unlike in *Frost*, Plaintiff did not suffer repeated injuries, he fell only once before December 2019.  In the almost year and a half after he suffered his initial injury, Plaintiff was able to navigate his way around the gym without falling.[6]  Thus, the Unsafe Conditions Defendants were not aware that Plaintiff had a proclivity of slipping on puddles because of his injury.  And Plaintiff did not inform the Unsafe Conditions Defendants that he had difficulty navigating any puddles in the gym because of his injury. *See Jones*, 2019 WL 33022358, at *7 (writing it was significant that the plaintiff told the defendant "about his difficulty maintaining balance while his hands [were] cuffed behind his back" and navigating a slippery floor).

Second, and related to the first, Plaintiff's condition is not one that "rendered him unable to provide for his own safety, prevent[ed] him from avoiding puddles or render[ed] him unable to perceive the slippery conditions." *Coleman v. Frauenheim*, No. 1:17-cv-01276, 2018 WL 2463855, at *4 (E.D. Cal. June 1, 2018).  Third, the record does not support that the Unsafe

---

[6] According to Plaintiff, he was able to walk around the facility after his injury, albeit in pain, by adjusting his stride and moving slowly. (Singer Decl. ¶¶ 7, 11 to Resp. Defs.' Mot Summ. J.).

Conditions Defendants knew that the puddle Plaintiff slipped on posed a serious risk and were deliberately indifferent to that risk.[7]  Specifically, the record does not show the Unsafe Conditions Defendants were aware the puddle was on the ground for a long period of time, and that Plaintiff's condition prevented him from avoiding the puddle and providing for his own safety.

These differences render this case unlike *Frost* and closer to *Jackson* and *LeMaire*. Although Plaintiff presents evidence that might support a tort claim of negligence, he has not presented evidence that could convert his slip and fall into an Eighth Amendment violation. Because no trier of fact could reasonably conclude that the Unsafe Conditions Defendants were aware of and deliberately disregarded a serious risk to Plaintiff's health or safety based on his December 2019 fall (or August 2018 fall for that matter), the Court finds that they are entitled to summary judgment on Plaintiff's unsafe conditions claim.

### c.  Qualified Immunity

Even if the factual circumstances support a finding of deliberate indifference to unsafe conditions, the Court finds that the Unsafe Conditions Defendants would be entitled to qualified immunity, and thus summary judgment would be granted in their favor on this alternative ground.

"Qualified immunity gives government officials breathing room to make reasonable but

---

[7] It also bears noting that the parties agree that the Unsafe Conditions Defendants typically implemented protective measures when a puddle was reported.  Specifically, the Unsafe Conditions Defendants' standard practice for reported puddles was for them and the gym porters to mop the floor and put warning cones around any puddle. (Michael Pascua Resp. Pl.'s Interrog. 8:17–20, Ex. B to Reply Pl.'s Mot. Summ. J.); (Scott Alexander Resp. Pl.'s Interrog. 8:17–20, Ex. B to Reply Pl.'s Mot. Summ. J.); (Singer Decl. ¶¶ 14–15, Ex. A to Pl.'s Mot. Summ. J.); (Develle Merritte Decl. ¶ 6, Ex. J to Pl.'s Mot. Summ. J.).  So, when dangerous conditions were observed, they engaged in remedial measures to ensure inmate safety.  The presence of these safety measures is particularly instructive given the Ninth Circuit's statement in *Frost* that "[s]lippery floors *without protective measures* could create a sufficient danger to warrant relief." *Frost*, 152 F.3d at 1129 (emphasis added).

mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)) ("The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"). Thus, to overcome a claim of immunity, plaintiffs must plead "facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Id.* at 735.

A government official's conduct violates clearly established law where the "contours" of the right are "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* at 741 (internal quotation marks and citation omitted). A "case directly on point" is not required for a right to be clearly established, however, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (emphasis added). In determining whether a right was clearly established the Court looks to "Supreme Court and Ninth Circuit law existing at the time of the alleged act." *Community House, Inc. v. Bieter*, 623 F.3d 945, 967 (9th Cir. 2010). Where there is no binding precedent, the courts should look to all available decisional law, including the law of other circuits and district courts. *Id.*

As stated, the facts of this closer are closer to *Jackson* and *LeMaire* than to *Frost*. In situations unlike *Frost*, the law is not sufficiently clear at what point "a bare claim of a slippery floor and a claim of a hazard plus some known exacerbating condition" turns into a substantial risk of serious harm. *Washington v. Sandoval*, No. 10-cv-0250, 2012 WL 987291, at *8 (N.D. Cal. Mar. 22, 2012). And because the law is not clearly established as to when a slippery floor

becomes sufficiently substantial for Eighth Amendment purposes in circumstances unlike *Frost*, it would not be clear to a reasonable prison official when the level of harm changes from being a risk of some harm to a substantial risk of serious harm. *See Gilman v. Woodford*, 2006 WL 1049739 (E.D. Cal. Apr. 20, 2006) (granting qualified immunity to defendants when prisoner slipped and fell in puddle of water resulting from leaky roof known to defendants), *aff'd by* 2008 WL 686740 (9th Cir. Mar. 12, 2008).  Accordingly, even if Plaintiff had provided evidence of an Eighth Amendment violation (for either fall), the Court would find Defendants are entitled to qualified immunity.

### 2.   Deliberate Indifference to Medical Conditions

The Eighth Amendment protects prisoners from inhumane conditions of confinement. *Farmer*, 511 U.S. at 832.  The government has an "obligation to provide medical care for those whom it is punishing by incarceration," and failure to meet that obligation can constitute an Eighth Amendment violation cognizable under § 1983. *Estelle v. Gamble*, 429 U.S. 97, 103–105 (1976).

In order to prevail on an Eighth Amendment claim for inadequate medical care, a plaintiff must show "deliberate indifference" to his "serious medical needs." *Id.* at 104.  "This includes 'both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference.'" *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (quotation omitted).

To meet the objective element of the standard, a plaintiff must demonstrate the existence of a serious medical need. *Estelle*, 429 U.S. at 104.  A "serious medical need[ ]" exists if the failure to treat a prisoner's condition could result in further significant injury or the "[u]nnecessary and wanton infliction of pain." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992) (citing *Estelle*, 429 U.S. at 104), *overruled in part on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).

To satisfy the subjective element, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

The Deliberate Indifference Defendants argue that Plaintiff cannot meet either element of the deliberate indifference standard. (*See generally* Defs.' Mot. Summ. J.). Accordingly, the Court begins by examining whether Plaintiff had a serious medical need.

### a.  Objective Standard

The Deliberate Indifference Defendants advance that Plaintiff did not suffer from a serious medical need because he did not have a "record of ever having been diagnosed with an Achilles tendon injury by a qualified medical professional." (Defs.' Mot. Summ. J. 12:23–24). Instead, "to the extent the Medical Records made by [Dr.] Wulff reflect a 'rupture' or 're-rupture' of the Achilles tendon, this notation was made based on statements from [Plaintiff] and were not a reflection of any medical diagnosis made by [Dr.] Wulff." (*Id.* 12:26–13:2).

Courts have generally agreed that a ruptured Achilles tendon is a serious medical need. *See, e.g.*, *Hemmings v. Gorczyk*, 134 F.3d 104, 109 (2d Cir. 1998) (ruptured Achilles tendon constitutes a serious medical need); *Fleming v. Weber*, No. 22-cv-581, 2023 WL 1995412, at *10 (D. Md. Feb. 14, 2023) (writing it was "undisputed" the plaintiff "suffered from a serious medical need when he ruptured his Achilles tendon"); *Turner v. Kirsch*, 2011 WL 1430300, at *5 (E.D. Pa. 2011) (same). So, if Plaintiff had a ruptured Achilles, it is clear he suffered from a serious medical need. The issue is whether there is a reasonable dispute of fact over whether Plaintiff ruptured his Achilles tendon.

During discovery, Dr. Wulff stated that Plaintiff "had a fully intact and structurally sound Achilles tendon [in July 2019]," and "[t]o the extent [his] notes reference a ruptured Achilles, this was based on statements made by [Plaintiff]." (Dr. Wulff Decl. ¶ 8, Ex. K to

Defs.' Mot. Summ. J.).  According to Dr. Wulff, although it was Plaintiff's subjective belief he suffered an Achilles tendon injury, objectively, his Achilles tendon was fine.  Thus, Plaintiff cannot claim to have suffered from a serious medical injury.

The issue with this argument is that Dr. Wulff's contemporaneous Medical Records when he examined Plaintiff and other responses in discovery indicate Plaintiff did suffer an Achilles tendon injury.  Specifically, Dr. Wulff's wrote during Plaintiff's July 2019 examination under a heading marked "impression" that Plaintiff had a "healed, untreated, Achilles tendon rupture." (Medical Records at 4, Ex. D. to Defs.' Mot. Summ. J.).  And Dr. Wulff explained that if Plaintiff "re-rupture[d] [his Achilles] then surgery can be considered at that time." (*Id.*).

First, it is curious that Dr. Wulff would mark Plaintiff as having an untreated Achilles tendon rupture based solely on Plaintiff's statements.  Second, for Plaintiff to re-rupture his Achilles, it bears to reason that he previously ruptured the tendon.  Finally, Dr. Wulff acknowledged during discovery that he "diagnosed Plaintiff with a healed, untreated, left Achilles tendon rupture." (Dr. Wulff Resp. Singer's First Set of Interrog. 7:1–3, Ex. F to Defs.' Mot. Summ. J.).  Viewing the evidence in the light most favorable to Plaintiff, these records create a material dispute of fact over whether Plaintiff in fact suffered an Achilles tendon injury.  Accordingly, at this stage, the Court finds that Plaintiff suffered an Achilles tendon rupture constituting a serious medical need.

### b.  Subjective Standard

Broadly speaking, Plaintiff's Eighth Amendment claim is predicated on two distinct theories.  First, Plaintiff advances that the treatments performed and recommended by Dr. Wulff were medically unacceptable under the circumstances, and that they were chosen in conscious disregard of his health. (FAC at 25–34).  Second, Plaintiff alleges that the Deliberate

Indifference Defendants delayed in providing him with medical care, and that this delay unnecessarily prolonged his pain. (*Id.*).

### i.  Inadequate Medical Treatment

Here, Plaintiff advances that because Dr. Wulff suspected an Achilles tendon rupture, he should have arranged for him to see a second specialist or obtain an MRI or surgery for his Achilles tendon. (Resp. Defs' Mot. Summ. J. at 7–8, 20–21).  "There is not one proper way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008) (internal quotation marks omitted).  "[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to the prisoner's health.'" *Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004) (alteration omitted) (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).  Thus, to violate the Eighth Amendment, the choice of treatment must have been "so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances." *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 989 (7th Cir. 1998).

Here, Plaintiff's subjective belief that he was entitled to alternative courses of treatment does not show Dr. Wulff's actions were unreasonable under the circumstances. *See Estelle*, 429 U.S. at 107 ("[T]he question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.").  Both times Dr. Wulff examined Plaintiff, he determined that Plaintiff's Achilles tendon had healed and was intact. (Medical Records at 2, 4, Ex. D to Defs.' Mot. Summ. J.).  He prescribed Plaintiff pain medication, a stretching regime to strengthen his

Achilles tendon, and an ankle brace. (*Id.*); (*see also* Singer Decl. ¶¶ 13, 17, 47, Resp. Defs.' Mot. Summ. J.).  Thus, Dr. Wulff made an individualized assessment and chose a treatment that, in his informed judgment, was medically appropriate for a healed Achilles tendon.  Dr. Wulff's assessment does not contain facts from which a reasonable jury could conclude he acted with a culpable state of mind.

    To show Dr. Wulff's diagnosis and choice of treatment was constitutionally inadequate, Plaintiff relies on the fact that he remained in pain despite adhering to Dr. Wulff's treatment plan.[8] (Resp. Defs' Mot. Summ. J. at 8).  But Plaintiff's chronic pain, while unfortunate, is not medical evidence showing Dr. Wulff's recommendation was medically unacceptable or in conscious disregard to his health. *See Richardson v. Dickinson,* No. 04-cv-1603, 2007 WL 184806, at *8 (E.D. Cal. Jan. 19, 2007) (finding no material dispute of fact where in "response to defendants' medical findings that he suffered from no tenderness or swelling, plaintiff merely argues that he did have swelling, tenderness, and discoloration").  Put differently, Plaintiff has not introduced facts showing his Achilles tendon was ruptured or required surgery.

    According to the Mayo Clinic, while "[s]urgery is often performed to repair" an Achilles tendon rupture, "[f]or many people . . . nonsurgical treatment works just as well." Mayo Clinic Staff, Achilles Tendon Rupture, https://www.mayoclinic.org/diseases-conditions/achilles-tendon-rupture/symptoms-causes/syc-2035323 (last visited July 11, 2024).  Thus, the fact that Plaintiff continued to experience pain, standing alone, is equally attributable to the nature of his injury rather than the alleged inadequacy of Dr. Wulff's care and judgment. *See Hoskins v. Peterson*, No. 09-cv-02, 2010 WL 11531398, at *6 (D. Idaho Sept. 30, 2010) ("The fact that Plaintiff continued to experience pain despite the doctor's visits and pain management program may reflect the on-going and chronic nature of his ailments, rather than the Jail's provision of medical care.").

---

[8] He further asserts that he cannot walk on his tiptoes. (Singer Decl. ¶ 21, Resp. to Defs.' Mot. Summ. J.).

1    At most, accepting Plaintiff's version of the facts as true, he presents a possible medical

2    negligence or malpractice claim against Dr. Wulff for misdiagnosis. *See Snowden v. Yule*, No.

3    2:17-cv-2167, 2023 WL 7168320, at *6 (E.D. Cal. Oct. 31, 2023) ("[T]he misdiagnosis of a

4    ruptured tendon as a strained or sprained tendon, without more, would at most constitute

5    negligence or medical malpractice."). But that is insufficient to establish deliberate

6    indifference. *Farmer*, 511 U.S. at 835–37; *see also See Wilhelm v. Rotman*, 680 F.3d 1113,

7    1123 (9th Cir. 2012) (finding that a doctor's decision not to operate because he incorrectly

8    believed plaintiff did not have a hernia was negligent misdiagnosis or disagreement with

9    diagnosing doctor and did not constitute deliberate indifference).

10   Plaintiff has submitted no evidence from which a reasonable jury could find that: "an

11   MRI was necessary sooner [or at all]; surgery was the only acceptable way to treat his [healed

12   Achilles tendon] injury; or the initial, nonoperative treatment chosen by [Dr. Wulff] was 'so far

13   afield of accepted professional standards as to raise the inference that it was not actually based

14   on medical judgment.'" *Randolph v. Buchanan*, No. 21-cv-108, 2024 WL 124749, at *6 (W.D.

15   Wis. Jan. 11, 2024) (quoting *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006)).

16   Accordingly, the Court finds that Dr. Wulff is entitled to summary judgment on this claim.

17                          ii. Delay in Medical Treatment

18   Next, Plaintiff contends that the Deliberate Indifference Defendants failed to provide

19   him with timely treatment for his condition, exacerbating his injury and prolonging his pain.

20   (FAC at 25–34). The Deliberate Indifference Defendants argue that they were not responsible

21   for any delay in Plaintiff's medical treatment, and even assuming there was a delay, Plaintiff

22   cannot show the delay harmed him. (Defs.' Mot. Summ. J. 14:1–15:7).

23   Delays in providing medical care may manifest deliberate indifference. *Estelle*, 429 U.S.

24   at 104–05. To establish a claim of deliberate indifference arising from a delay in providing

25   care, a plaintiff must show that the delay led to further harm and that the defendants

purposefully ignored his medicals needs knowing about the risk of harm from delay in treatment. *See McGuckin*, 974 F.2d at 1060 (noting that delays in receiving medical care must be harmful and that "[a] defendant must purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established"); *Hallett v. Morgan*, 296 F.3d 732, 746 (9th Cir. 2002) (noting that the defendants must be aware that a delay in treatment would be harmful).

Here, the Court finds that the Deliberate Indifference Defendants were not responsible for any delays with Plaintiff's medical treatment from August 2018 to July 2019. Additionally, even if the Deliberate Indifference Defendants were responsible for any delay in Plaintiff's medical treatment up to the filing of this lawsuit, the record does not show Plaintiff was harmed by the delay.

First, Dr. Wulff is not responsible for any delay because he neither knew of Plaintiff's condition from August 2018 to July 2019 nor had any control over scheduling Plaintiff for appointments. The Ninth Circuit's decision in *McGuckin* is instructive. In *McGuckin*, the plaintiff was denied a necessary surgery for over three years and suffered extreme pain during that delay. 974 F.2d at 1061. The only two defendants in that case were plaintiff's treating physicians. *Id.* at 1059. Though the seriousness of plaintiff's medical condition was not disputed, the Ninth Circuit held that the district court had properly granted summary judgment to the physicians because the record showed that prison administrators were responsible for scheduling diagnostic examinations and surgeries, not the doctors. *Id.* at 1062. Because the doctors did not control when the plaintiff was scheduled for surgery, they were not responsible for the delay and were not deliberately indifferent to plaintiff's medical condition. *Id.*

Like the physicians in *McGuckin*, Dr. Wulff does not control scheduling at HDSP because he is an outside contractor. (Dr. Wulff Decl. ¶ 7. Ex. K to Defs.' Mot. Summ. J.). Moreover, there is no evidence that he knew of Plaintiff before July 2019. Dr. Wulff asserts he

did not meet Plaintiff until he examined him on July 24, 2019. (Dr. Wulff Resp. Pl.'s Interrog. 11:15–18, Ex. F to Defs.' Mot. Summ. J.). Without evidence that Dr. Wulff controlled scheduling or knew of Plaintiff, Plaintiff has failed to raise a triable issue of fact that Dr. Wulff was responsible for any delay.[9] *See Walker v. Benjamin*, 293 F.3d 1030, 1038 (7th Cir. 2002) (doctor entitled to summary judgment where plaintiff presented no evidence that delays between plaintiff's initial visit, diagnosis and visit to the specialist were within the doctor's control).

Second, the Court finds that Defendants Faulkner and Nash were also not aware of the alleged delay. To show Defendants Faulkner and Nash were aware of his condition, Plaintiff submits that they responded to his grievances and, by virtue of their positions at HDSP, were responsible for his overall health and safety. (Resp. Defs.' Mot. Summ. J. at 16–17, 21–22). But the grievances Plaintiff relies on were submitted after he saw Dr. Wulff in July 2019. (Mar. 2020, Grievance, Ex. M-M to Pl.'s Mot. Summ. J.); (Mar. 2020, Inmate Request Form, Ex. O-O to Pl.'s Mot. Summ. J.). And the Court declines to find that Defendants Faulkner and Nash had an obligation to proactively ascertain Plaintiff's condition by virtue of their positions at HDSP. Therefore, the record does not show that Defendants Faulkner and Nash were aware of any delay in Plaintiff's medical treatment before July 2019. Because the Deliberate Indifference Defendants were not aware of Plaintiff's condition, they could not be responsible for any delay in his treatment.

Even assuming the Deliberate Indifference Defendants were responsible for any delay in Plaintiff's treatment both before and after July 2019, the Court finds that any delay was not

---

[9] Plaintiff's Response is unclear, but it appears to contend that Dr. Wulff was responsible for his delay in treatment because he conducted only one open clinic day a month at HDSP. (Resp. Defs.' Mot. Summ. J. at 20); (*see* Dr. Wulff Resp. Pl.'s Interrog. 4:21, Ex. F to Defs.' Mot. Summ. J.) (identifying that "[o]n average, [he] conducted one clinic per month at HDSP"). While the Court recognizes Plaintiff's frustration, it finds Plaintiff's constructive delay argument is without merit. Moreover, without evidence showing Dr. Wulff treated Plaintiff during one of his open clinic days, the Court declines to find that he knew of Plaintiff and his condition.

harmful.  The Court acknowledges Plaintiff's concern that he did not see a specialist until over a year after his injury.  And it recognizes that after this 11-month period, Plaintiff did not receive a referral to a second specialist or obtain an MRI.  The issue, however, is that Plaintiff has provided no evidence suggesting that any delays in his medical treatment ultimately caused him harm. *McGuckin*, 974 F.2d at 1059.  Dr. Wulff's Medical Records reflect that Plaintiff's Achilles tendon was healed and intact, and that any symptoms, if related to a rupture or (potential re-rupture), should stabilize over time with strengthening exercises.  In other words, there is no medical evidence that Plaintiff suffered serious aggravation of the injury or permanent impairment.

According to Plaintiff, the harm he suffered is continued pain from the delay and the inability to walk on his tiptoes.  (*See generally* Singer Aff. ¶¶ 21, Resp. to Defs.' Mot. Summ. J., ECF No. 41).  Plaintiff's position is that had he received an MRI or surgery, these harms would not have occurred.  But there is no medical evidence suggesting that he required surgery or an MRI.  That is, "Plaintiff failed to provide an expert medical opinion demonstrating that any remaining symptoms were caused by the delay, as opposed to simply being residual symptoms [he] may face regardless of treatment." *Torrence v. Hsueh*, No. 2:10-cv-1222, 2013 WL 322155, at *26 (E.D. Cal. Jan. 28, 2013).  Without this evidence, the record lacks evidence lending itself to the inference that he was harmed by any alleged delay.

In sum, the Court finds that the Deliberate Indifference Defendants are entitled to summary judgment for Plaintiff's delay in medical treatment claim for two reasons.  First, these Defendants were not responsible for any delay in treatment between August 2018 and July 2019.  Second, to the extent there was any delay in treatment from the date of Plaintiff's injury to the time of his FAC, Plaintiff has not shown that he was harmed by any alleged delay.

Accordingly, the Court finds that Defendants are entitled to summary judgment on both of Plaintiff's Eighth Amendment claims.[10]

### B. Plaintiff's Motion for Summary Judgment

When evaluating Plaintiff's Motion for Summary Judgment, the Court must view evidence in the light most favorable to Defendants. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999). Because Plaintiff bears the burden of proof at trial, he must affirmatively demonstrate that no reasonable trier of fact could find other than for him. *See Celotex*, 477 U.S. at 323. The Court denies Plaintiff's cross-motion because Defendants' evidence, viewed in the light most favorable to them, raises a dispute of material fact regarding all claims. Accordingly, Plaintiff's cross-motion for summary judgment is DENIED.

## IV.    **CONCLUSION**

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment, (ECF No. 26), is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment, (ECF No. 25), is **DENIED**.

**IT IS FURTHER ORDERED** that the Clerk of Court is instructed to close the case and enter judgment accordingly.

**DATED** this  _23_  day of July, 2024.

_____

Gloria M. Navarro, District Judge
UNITED STATES DISTRICT COURT

---

[10] Defendants also moved for summary judgment as to Plaintiff's claim for punitive damages on the grounds that there is no evidence establishing they acted with evil motive or intent or with reckless and callous indifference. (Defs.' Mot. Summ. J. 20:13–21:9). The Court does not reach the issue because it finds Defendants are entitled to summary judgment on Plaintiff's claims for the reasons stated above.